Estate of Berman Barad, Deceased, Ada Lenobel, Selina Schoenfeld, Edie Sandler, Harvey Jules Barad, Executrices v. Commissioner.
Estate of Barad v. Commissioner
Docket No. 39574.
United States Tax Court
1954 Tax Ct. Memo LEXIS 275; 13 T.C.M. (CCH) 223; T.C.M. (RIA) 54082; March 16, 1954
Samuel Brodsky, Esq., for the petitioners. W. Preston White, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency of $19,441.83 in petitioners' estate tax for the year 1948. The sole contested issue is whether a transfer by the decedent of certain shares of common stock in 1941 constituted a transfer made in contemplation of death or a transfer in which decedent retained possession or enjoyment of, or the right to the income from, the property until his death within the meaning of section 811 (c) of the Internal Revenue Code. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners filed an estate tax return *276 with the collector for the first district of New York. Berman Barad, hereinafter referred to as decedent, was born in Rumania. Decedent emigrated to the United States in 1903, when he was about 12 years of age, with his mother, father, three sisters and one brother. Decedent began working almost immediately after his arrival in the United States. Before 1916 he had operated, successfully, a candy stand, a paper bindery and a leather trading company. In 1916, decedent founded the Barad Tool & Supply Company, Inc., hereinafter called the Company, with $40 supplied by his sister Anna. The Company engaged in the business of buying and selling machine cutting tools. Decedent's family continued to live together until 1921, when he married his first wife, Hattie Michaelberg. Decedent's first wife worked with him in the Company, helping him in purchasing; in making bids for merchandise; in typing; in answering the telephone; and in other aspects of operating the business. By 1934, the Company was successful. In 1934, decedent's first wife gave birth to their only child, Harvey Jules Barad, and died in childbirth. Shortly after the death of decedent's first wife his married sister, *277 Ada Lenobel, who had 4 years earlier lost her own child, offered to care for Harvey, but decedent insisted that he and Harvey live in the same apartment with his sister Ada and her husband, and his sister Anna Barad. Accordingly, Ada Lenobel and her husband gave up their own apartment, and Anna Barad gave up living with her father, and they all moved with decedent and Harvey into a large apartment which decedent rented. From that time forward, decedent paid for all expenses, including rent, food and other expenses pertaining to the entire household. In addition to the household expenses, decedent occasionally gave his sister Ada Lenobel money for her own expenses. He paid the expenses of an operation she had in 1931, and of her two major operations in 1942. He also had taken out a life insurance policy payable to his sister in the amount of $1,000 before his first marriage, which she received at his death. Decedent's sister Anna did the cooking for the household, and attended to decedent's personal needs, including laundry and mending of his clothes. Decedent's sister Ada Lenobel was responsible for the care and upbringing of his son Harvey. She nursed him through various illnesses *278 and operations when he was 2 to 3 years old, and tried to substitute the love that his mother, had she lived, would have given him. Decedent was exceptionally devoted to Harvey. By 1939, when his son was 5 years old, he had formulated a plan to set up a trust for Harvey's benefit, and advised his sisters Ada and Anna that he wanted to set up such a trust. At that time, decedent had no intention of remarrying and the plan was entirely unrelated to any possibility of remarriage. Ada and her husband were in poor circumstances, and she wanted to go to work, but decedent was opposed to her working, and preferred that she stay with Harvey. Since 1918, decedent had always taken care of his oldest sister, Anna, who was unmarried. Decedent also wanted to do something for Ada, who had struggled since her marriage to make ends meet. Decedent told Ada that he wanted to provide in the trust that whoever took care of Harvey should receive $20 a week. Although decedent lost a considerable sum of money in the stock market crash of 1929, he never again speculated in the market or lost any more money there. And he informed his attorney that he would never speculate in Wall Street again. Although *279 decedent was a generous man, he was not such a free spender as to endanger his business or personal finances in any way. Ada began to urge decedent to set up the trust immediately after he suggested it. Discussions between them took place at their home, sometimes until late at night. Ada knew, and counted on the fact, that as long as Harvey was taken care of, she, too, would have security. She, and her sister Anna, before 1941, frequently and actively urged decedent to set up a permanent trust for Harvey's security. On April 27, 1941, decedent, then 51 years of age, was married to his second wife, Betty Kazen. Harvey, however, continued to live with Ada Lenobel and her husband up to the time he went to college. Decedent complained of difficulties with his second wife about a month after the marriage and thereafter on the ground that she was always demanding more and more money from decedent for herself and for the support of her parents; that she never stayed in the home decedent had furnished for her; and that he was forced to eat all his meals out. Decedent's second wife also refused to have anything to do with Harvey, decedent's son. Demands were continuously instigated by *280 his wife's sister and mother, and she was always trying to get as much from him as she possibly could get. As time went on, decedent complained that he couldn't get along with his second wife and that he was afraid of a divorce action because she would attempt to get as much alimony as possible, that she would take all of his earnings in alimony. In the summer of 1941, decedent came to stay with his sisters and they urged him to set up a trust for Harvey, telling him that he talked a lot about it, but neglected and delayed it without reason. In the morning before he left them, he promised them that he would attend to it. He also told them that he had been advised by his accountant that a trust would save income taxes, since he was in a high tax bracket. The trust was executed by decedent on November 14, 1941, and Ada Lenobel signed it as the designated trustee. Later the same day decedent expressed to his sister Ada his happiness that he had finally attended to what he had planned for several years, and that was a load off his shoulders. Until the trust was created, decedent felt he had disappointed his sisters, Ada and Anna, who had constantly urged him to provide for Harvey, *281 and who had sacrificed so much in caring for the child. Decedent knew that the trust pleased Ada and Anna, and that they would be taken care of indirectly, Ada as the trustee, and Anna as part of the household family. Thereafter, his sisters Ada and Anna no longer urged decedent to do anything for Harvey, since their purpose had been accomplished. Decedent felt a strong moral obligation to his first wife because of her valuable assistance in making the business of the Company a success. In creating a trust for Harvey's benefit with stock of that corporation, decedent was motivated by a desire to fulfill that obligation and to give to Harvey property which the first wife would have enjoyed had she lived. Another motive for the trust urged upon decedent by his sister Ada was to put the trust property beyond the reach of decedent's second wife in a possible divorce action as a basis for large alimony claims. Decedent had a great fear that in any divorce action, the husband was on the losing side, and that the alimony would be so excessive as to make the cost of a divorce prohibitive. In creating the trust with stock of the Company, decedent was motivated by a strong desire for his *282 son to grow up in his business, and to be a partner in the business with him. He envied other businessmen who had sons in their business, and hoped that eventually Harvey would take over the entire business when decedent would retire. Prior to the creation of the trust decedent had never discussed the subject of what his second wife might inherit from him with his sister Ada. He never talked to Ada about the possibility of his second wife outliving him. He had never discussed with his attorney what would happen if decedent died and his second wife survived him. He never discussed it with his close friend, V. Koodroff. The trust in part provided: "WHEREAS, the Grantor is the father of HARVEY JULES BARAD by a prior marriage, and "WHEREAS, his son, HARVEY JULES BARAD, is living separate and apart from the Grantor and has since the demise of his mother, been living with his Aunt, ADA LENOBEL, and "WHEREAS, in view of the care, custody and control having been lodged with ADA LENOBEL, for approximately seven years, and "WHEREAS, the Grantor desires to create a Trust for the benefit of the education, support and maintenance of his said son through the Trusteeship and custody of *283 his said Aunt, ADA LENOBEL, and "WHEREAS, to effectuate said objects, the Grantor is desirous of setting up a Trust Fund consisting of * * * stock of the BARAD TOOL & SUPPLY CO., INC., a New York Corporation, for the purpose of enabling his son HARVEY JULES BARAD, hereinafter described as the Beneficiary, to maintain himself and to complete his education, free of parental control. * * *
"FIRST: The Trustee shall hold the property comprising the Trust above set forth, collect and receive the income and profits thereof and dispose of the principal and income as follows: "(a) To accumulate the income of the said Trust Fund until the Grantor's son, HARVEY JULES BARAD shall have arrived at the age of fifteen years. "(b) Excepting as hereinafter limited, to pay over or apply the current income quarter-annually to the Beneficiary, beginning with his fifteenth birthday, until he arrives at the age of thirty-five years, and thereupon and at that time, to pay over the principal and any accumulated income to him absolutely. "(c) During the period from the fifteenth birthday of said Beneficiary and his twenty-first birthday, the Trustee shall apply so much of the net income of the *284 Trust Estate as in her judgment may be advisable towards the support, comfort and education of the Beneficiary, and her judgment in that regard shall be unquestioned and in her sole discretion. Any balance of net income not so applied by the Trustee, shall be accumulated and added to the principal of the said Trust until the Beneficiary shall have reached the age of twenty-one years. "(d) Upon the Beneficiary attaining the age of thirty-five years, the corpus of the said Trust and all the accumulated earnings shall be paid over to the Beneficiary absolutely. * * *
"(f) In the event of the death of the Beneficiary prior to his having received all of the Trust Estate and income above set forth, the balance of the Trust Estate and income in the hands of the Trustee shall be paid over by said Trustee to herself to be her property absolutely and forever. * * *
"FIFTH: In the event of the death, resignation or incapacity of ADA LENOBEL, the Trustee above named, her successor as such Trustee shall be ANNA BARAD, of the Borough of The Bronx, City of New York, and in the event that either the Trustee herein named or the said ANNA BARAD shall die, resign or become incapacitated, *285 the successor Trustee shall be SELINA SCHOENFIELD of Baltimore, Maryland." In the event that the trust income was insufficient for the support, education and maintenance of the beneficiary the trustee could, in her sole discretion invade the principal of the trust. Prior to the date of decedent's death, none of the income of the trust was used for the support, maintenance or benefit of Harvey. The corpus of the trust consisted of 120 shares of stock of the Company (having a value at that time of approximately $40,000 to $50,000) out of a total of 250 shares outstanding. A few weeks after the trust was created, the trustee received a dividend of $6,000 on the stock, and in each of the following 3 years the trustee received $1,230. After the trust instrument was executed, decedent continued to have trouble with his second wife and about 20 months after the marriage she left him. They lived apart for about a month and then went back together again. About this time, some time in 1943, decedent transferred 3 additional shares of the Company stock to the trust and 3 shares to his sister, Anna, so that the trust and decedent's sister, would have control of the Company. In 1943 when *286 decedent's second wife left him, he was very much upset and decided to draw a will, leaving her as little as possible. Prior to this time he had never discussed his will with his sister, but he had from time to time discussed his status with his attorney. When the will was drafted in 1943, he attempted to leave his wife a legacy that was below the legal minimum. Decedent had confidence in his own business ability, and expected to be able to take care of his son, Harvey, in the way that he always did, even though he was remarried. The attorney for decedent throughout his adult life, from about 1912, drew the trust instrument. Decedent never spoke to or consulted with him about a will until January or February 1943, approximately 15 or 16 months after the trust was created. The will was executed on June 21, 1943, some 19 months after the trust. Decedent's sister Ada knew of no other will except a will which he might have made in 1929, 5 years before Harvey's birth. In 1941, when the trust was executed, the decedent's health was shown by a physical examination just prior to his second marriage to be good. Decedent was vigorous and hard-working. In May 1947, he had his appendix removed. *287 Following that operation, he returned to work, and did hard physical work, lifting and moving cases of merchandise. Complaints thereafter were diagnosed by his personal physician and two other medical authorities as due to adhesions resulting from the operation. Not until December 1947, was his condition diagnosed as cancer in the abdominal region. He underwent surgery again, and died on January 7, 1948. Decedent's father lived to the age of 86 years, and decedent always assumed that he would reach the same age. In 1929 he had a kidney stone removed, but from that time until 1947, he was never seriously ill. The first time he indicated to his sister Ada that he felt he might be seriously ill was about 4 weeks before his death. Although decedent spoke to Koodroff about having a fear of paying alimony he did not discuss with him what the result would be in a court action. When decedent spoke to Koodroff, near the end of the war, about the possibility of a divorce he told Koodroff he had taken the necessary steps for a will or trust. The executrices of the Estate of Berman Barad on January 11, 1949 paid to the collector of internal revenue for the first district of New York the *288 sum of $12,710.36, representing the amount of the estate tax shown to be due on the Federal estate tax return of the Estate of Berman Barad. The executrices of the estate of decedent on January 11, 1949 paid to the New York State Tax Commission the sum of $891.68, representing the New York State estate taxes shown to be due on the New York State estate tax return of the estate of decedent. Subsequent to June 1949 and before April 1, 1953, petitioners necessarily incurred and paid additional administration expenses and attorneys' fees in the administration of the estate, over and above the amounts claimed in the estate tax return filed by them, in the sum of $2,985. The property included in the trust established by decedent on November 14, 1941 was not transferred in contemplation of death. Opinion On what is the essential question of fact, involving the contemplation of death issue, we have made findings which decide the matter. Without detailing the various factors, we have concluded that as to this, petitioners have sustained their burden of showing that decedent's impelling motives for the transfer were not primarily or dominantly associated with the prospect of death. *289 United States v. Wells, 283 U.S. 102. Respondent contends in the alternative that petitioner retained the income from the property by providing that it could be used for his son's support during a part of the boy's minority. But decedent was not one of the trustees who alone could, in their discretion, determine whether such a use should be made of the income. When that situation exists, the property is not includible in the gross estate. Estate of Payson Stone Douglass, 2 T.C. 487, acq. 1944 C.B. 7, affd. (C.A. 3) 143 Fed. (2d) 961. By reason of claims of overpayment due to administration expenses incurred after the return was filed, Decision will be entered under Rule 50.